Filed 3/16/16  In re E.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

> **California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.L., a Person Coming Under the Juvenile Court Law. | H042777 (Santa Clara County Super. Ct. No. 115JD23161) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.R., <br><br> Defendant and Appellant. | |

## I.  INTRODUCTION

D.R. is the father of E.L., the child at issue in this juvenile dependency proceeding.  The father appeals from the juvenile court's order granting a Welfare and Institutions Code section 388[1] petition and suspending his visitation with the child.  For reasons that we will explain, we will affirm the juvenile court's order.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## II.    BACKGROUND

### A.    *Section 300 Petitions, Initial Hearing Report, and Detention Hearing*

On March 24, 2015, the Santa Clara County Department of Family and Children's Services (the Department) filed a petition under section 300, subdivision (b) [failure to protect], alleging that the child, age 15 months, came within the jurisdiction of the juvenile court.  The petition alleged the following facts.

The father had left the child in the care of a person who was suffering from acute symptoms of a mental illness and was under the influence of marijuana.  The caretaker had allowed the child to "go his way," and the child was found wandering around in a parking lot, unattended.  The caretaker had no contact information for the child's parents.

The father's criminal history included battery on a former spouse, infliction of corporal injury on a spouse or cohabitant, possession of controlled substance paraphernalia, and grand theft.  The father had a history of substance abuse, having tested positive for methamphetamine in December of 2014 and having refused or failed to drug test on several occasions.  Following the positive test, the father had declined to participate in Voluntary Family Maintenance services.

The mother also had a criminal history that included possession of a controlled substance, driving under the influence, using or being under the influence of a controlled substance, disorderly conduct, solicitation of a lewd act, and prostitution.  The mother was a registered narcotics offender and the subject of a restraining order, as to which the father was the protected person.  The mother had participated in drug treatment programs but continued to abuse drugs.  The mother had been diagnosed with Bipolar Disorder and had a history of psychiatric hospitalizations and holds but was not medication-compliant.  The mother's three other children were no longer in her care:  she had voluntarily placed one child for adoption; a second child was in the care of her paternal grandparents; and a third child was in the care of her father pursuant to dependency court orders.

An initial hearing report filed on March 25, 2015 reported that the child was in a foster home, where he was doing well.  The father told the social worker that he wanted the child returned to him.  He denied knowing about the mental illness or marijuana use of the caregiver with whom he had left the child.  The father reported that he had obtained full custody of the child in family court.  The mother confirmed she did not have custody of the child.  The mother described the father as a daily methamphetamine user.

At the detention hearing held on March 25, 2015, the juvenile court found that continuance in the parental home would be contrary to the child's welfare and that removal from the parents' custody was necessary to protect the child's physical or emotional health.  The court determined that a prima facie showing had been made that the child came within section 300, and it ordered the child detained.  The court ordered supervised visitation for both parents for a minimum of two hours, two times per week.

A first amended section 300 petition was filed on April 22, 2015.  The amended petition added an allegation that the father had declined a drug test on March 23, 2015 and tested positive for methamphetamine on March 27, 2015.

**B.       *Jurisdiction/Disposition Reports and Jurisdiction Hearing***

The Department filed a jurisdiction/disposition report dated April 16, 2015, recommending that both parents receive reunification services.  At the time, the child remained in an emergency satellite foster home.  The father had pending criminal charges including assault, hit and run, and vandalism.  The father denied having a substance abuse problem.  The social worker recommended that both parents undergo a domestic violence assessment and a drug evaluation, and that the mother undergo a psychological evaluation and participate in counseling.  The social worker also recommended both parents participate in parent education, drug test weekly, and attend AA/NA meetings at least three times per week.  The social worker recommended supervised visitation for both parents, two times per week, for two hours at a time.

In an addendum report also dated April 16, 2015, the social worker reported that the father had failed to drug test on April 9, 2015. The social worker also reported on a number of police reports, including several involving domestic violence between the mother and the father.

In an addendum report dated May 8, 2015, the social worker reported on an April 16, 2015 interview of the parents. The mother had told the social worker that the father's positive drug test on March 27, 2015 was the result of her putting methamphetamine in a salt shaker. However, after the father left the room, the mother told the social worker that this was a lie; the father had asked her to make up that story.

On May 8, 2015, the mother submitted the petition on the Department's reports, and the juvenile court held a contested hearing as to the father. The juvenile court found the allegations of the first amended petition true.

### C.       *Pre-Disposition Addendum Reports and Disposition Hearing*

In an addendum report dated May 28, 2015, the social worker reported on statements made by the father. The father had expressed concern about the child's health and about the fact that the child had been placed with an African-American family. The social worker also reported that the father had undergone a drug evaluation, but that he had not yet started drug testing.

In an addendum report dated July 1, 2015, the social worker reported that the mother was in residential treatment. The father had not yet provided evidence of drug testing or participation in drug treatment or AA/NA meetings. During a visit with the child, the father "had to be redirected to not discuss the case on several occasions, repeatedly clapped loudly at [the child] causing disturbance, and refused to discontinue videotaping the visit after being asked to do so." The father had also "displayed several concerning behaviors" during a medical examination of the child. He had been uncooperative with the doctor and evaluator, asked inappropriate questions, raised his voice, and complained about the foster home, causing the appointment to take about

4

two hours.  The father had to be told that his behavior was upsetting to the child.  The social worker recommended the father complete a psychological evaluation.

A contested disposition hearing was held on July 1, 2015.  The juvenile court adopted the Department's recommendations.  The court declared the child a dependent of the court and ordered the child's removal from the parent's custody.  The court adopted a case plan that required both parents to participate in the Parent Orientation Class, a parenting class, counseling, psychological evaluations, drug testing, a 12-step program, a substance abuse assessment and any recommended drug treatment program, an aftercare drug treatment program, and a domestic violence assessment.  The juvenile court ordered both parents to have supervised visitation with the child two times per week for two hours per visit.

### D.    *Restraining Orders Applications and Section 388 Petition*

On July 6, 2015, the child's attorney filed a request for a restraining order against the father.  The request sought protection for the child, the child's caregiver (a paternal second cousin), and the caregiver's child (a paternal third cousin).  The request alleged that on July 3, 2015, the caregiver learned that the father had been placed on a "51/50 hold" and was trying to locate the caregiver's address.  The police informed the caregiver that the father "had completely lost it."  The father was known to possess a gun.

The juvenile court issued a temporary restraining order and set a hearing for July 28, 2015.

On July 10, 2015, the Department submitted a request for a restraining order against the father, asking for protection of social worker Linda Plymale-Muratore.  The social worker submitted a declaration in support of the restraining order application.  The social worker confirmed that the father had been placed on a mental health hold by the Los Gatos Police Department on July 3, 2015, after he had harassed and scared an employee at a flower shop by saying he was "looking for bullets for his gun amongst the flowers in the store."  The father had told the police that he was "the President of the

5

United Planets of America" and had repeatedly stated that he "had to get his weapon." The father had also made a threat to the paternal aunt, stating, "If I lose my baby I'm gonna shoot every last one of them. I'll pick them off one by one. My dad is cleaning his guns." The social worker further described the father's "disturbing behaviors" during his supervised visits with the child, including a recent incident in which the father had run across the street "in front of moving traffic" to pick up traffic cones, while holding the child, "for no apparent reason." The social worker also described the incidents in which the father had become disruptive during a doctor's appointment, made loud clapping noises that scared the child, and expressed anger about the case.

The juvenile court issued a temporary restraining order and set a hearing for the same day as the other restraining order hearing: July 28, 2015.

Also on July 10, 2015, the Department filed a section 388 petition, in which it requested the juvenile court suspend the father's visitation with the child.[2] The social worker repeated the allegations made in her restraining order application concerning the flower shop incident, threats, and visitation incidents. The social worker asserted that visitation would be dangerous due to the father's "poor emotional health and his volatile and dangerous behavior."

On July 13, 2015, the juvenile court issued an order suspending the father's visitation pending a hearing, which it also set for July 28, 2015.

On July 28, 2015, after the father requested a continuance, the Department and the child both sought reissuance of the temporary restraining orders against the father. The juvenile court reissued the temporary restraining orders, reset the combined hearing for

---

[2] Under section 388, subdivision (a)(1) a "person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . ."

July 31, 2015, and ordered the father to turn over his firearm, which the father asserted was in a gun safe at his mother's house.

In an addendum report filed on July 31, 2015, the Department reported on the status of the father's firearm. The father's mother had told the social worker there were no firearms currently at her home. The father's mother reported that her stepson might have taken the father's firearm many years earlier.

The Department also reported on the father's medication compliance. The father had told the social worker that he was not taking any psychotropic medications and that he did not believe he needed any such medications. The father was also not in therapy.

### E.      Hearing

A contested hearing on the restraining order applications and section 388 petition was held on July 31, 2015.

Social worker Plymale-Muratore testified on behalf of the Department and was designated an expert in risk assessment of dependent children. Plymale-Muratore had not supervised any of the father's visits with the child, but she had observed some of the visits. She had been present at the visit where the father had clapped loudly at the child's ear, as well as at the doctor's visit where the father had been uncooperative, disruptive, and agitated. A social worker who had supervised other visits told Plymale-Muratore about other concerning behavior by the father. The concerning behavior included the incident in which the father ran out into the street while holding the child.

To the social worker's knowledge, the father had not engaged in any aspect of his case plan. She believed suspension of visitation was in the child's best interests due to the father's unaddressed mental health issues and failure to participate in drug treatment.

The father testified on his own behalf. He acknowledged running across the street while holding the child during a visit but claimed it was "not irrational." He had tripped and fallen because of a hole in the lawn at the visitation site, and he had crossed the street

7

in order to get cones to put around the hole so that no one else would trip and fall. The father submitted photos of holes in the lawn and cones.

The father then discussed his "5150 hold," asserting that a toxicology screen taken that day showed he was negative for methamphetamine and amphetamines but "off scale positive for phencyclidine [(PCP)]." Essentially, he had taken a "lethal dose" of PCP but had somehow survived. Defendant submitted documents including a lab report showing the presence of PCP. He did not know how he had ingested PCP, but he believed "somebody from the drug company" was trying to "eliminate" him due to his research and opposition to the chemicals used in vaccines.

The father explained why he had loudly clapped his hands near the child's ears during a visit. He had been attempting to show his mother and aunt that the child had hearing problems, which he believed were caused by vaccinations.

At the hearing, the child's attorney expressed her belief that the Department had met its burden on its section 388 petition. She agreed that visitation would be detrimental to the child due to the father's "significant mental health issues that need to be stabilized."

The mother's attorney argued that the Department had not made a sufficient showing to support the granting of the section 388 petition. She acknowledged the evidence of the father's erratic behavior but argued that "things" could be "put in place to ensure that the visits and the quality of visits are going well." She asserted that the mother was doing well in "her own recovery and services" and believed that continued contact with the father was beneficial to the child.

The father indicated he had "no problem" with the issuance of restraining orders to protect "the adults," but he asked the juvenile court not to suspend his visitation with the child. The father asserted that his drug history had been "blown out of proportion" and that his behavior was motivated by his sincere belief in the danger of vaccines.

8

### F.      Juvenile Court Findings and Orders

The trial court granted both requests for restraining orders, and it granted the section 388 petition in part. The court found, by clear and convincing evidence, that visits between the father and the child would pose a "serious risk of physical and emotional harm to the child." The court explained it was concerned about the father's drug use and his claim of not knowing how the drugs got into his system: "and so I'm concerned about ongoing substance abuse." The court found that the father's explanation for running across a street with the child did not make sense, that the flower shop incident was "very serious," and that it appeared the father was not in control of the thoughts in his head. The court was very concerned about the father's mental health and his behavior at the doctor's appointment. The court was concerned about the father's "prior criminal record for violence" and his claim that he owned a firearm, as well as his failure to surrender the firearm.[3]

The juvenile court ordered the father's visitation suspended until he participated in the psychological evaluation that had previously been ordered.

### G.      Further Proceedings

On August 31, 2015, the Department filed an interim review report. Neither parent had begun the Parent Orientation Class. The father had attended only one parenting class. Neither parent was participating in counseling. The mother had completed a psychological evaluation and the father's evaluation was scheduled. The mother had been drug testing, with negative results, but the father had not been testing.

---

[3] The juvenile court later questioned the father further about the firearm. The father explained why he had previously claimed the gun was at his mother's house. In 1989, he had been arrested, and his vehicle had been picked up by his stepfather and stepbrother. His stepbrother had stolen some items from the vehicle. The father had believed that his stepfather had put the gun in a safe, but he now realized that his stepbrother must have stolen the gun. The father claimed he did not have access to any other guns. However, the juvenile court found the father's testimony inconsistent on this point and made a finding that the father had a gun that he had not surrendered.

9

The mother had been participating in 12-step meetings, but the father had not provided any information about whether he was participating. The mother had completed inpatient drug treatment and had completed two sessions of outpatient service. The father had completed a drug assessment and had been referred for treatment, but he did not follow up. Overall, the mother had made "some progress" in her case plan, but the father had made no efforts to begin his case plan. The mother had been visiting with the child.

At a hearing held on August 31, 2015, the juvenile court continued its prior orders. Following that hearing, on September 2, 2015, the father filed a notice of appeal from the orders issued on July 31, 2015.

In an interim review report dated October 14, 2015, the Department reported that the mother was continuing to work on her case plan. The father was "partially compliant." The father had completed a parent orientation class and some parenting classes, although he had expressed reluctance to work on some of his issues. He had not started therapy or drug testing. He had participated in a domestic violence assessment and a psychological evaluation. The evaluator found the father to have developed a "persecutory ideation style" and to present a risk of becoming frustrated and aggressive. The Department recommended the father be permitted to visit with the child once a week, for one hour at a time, under "close supervision and close monitoring" as long as the social worker had discretion to terminate a visit if the father failed to follow the rules or behaved inappropriately.

At a hearing on October 21, 2015, the juvenile court adopted the Department's recommendations, ordering the father to have supervised visitation with the child once a week for one hour at a time. The juvenile court signed an amended restraining order that permitted visitation with the child.

At the six-month review hearing held on February 8, 2016,[4] the juvenile court found a substantial probability that the child would be returned to the parents within the next six months and continued reunification services to the 12-month review hearing. The court ordered the father to have visitation with the child once a week for two hours per visit. The court further ordered that the social worker had discretion to increase the frequency and duration of the visits, to permit unsupervised visits, and to permit overnight visits.

### III.   DISCUSSION

The father contends the juvenile court erred by suspending his visitation at the July 31, 2015 hearing. The Department contends the father's appeal was rendered moot by the juvenile court's subsequent orders reinstating visitation, and the Department requests this court dismiss the appeal.

#### A.   *Mootness*

"An appellate court will not review questions which are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. [Citation.] An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.] On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding. [Citation.]" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054-1055.)

The appellate court in *In re C.C.* (2009) 172 Cal.App.4th 1481 (*C.C.*) declined to dismiss as moot a mother's appeal from an order suspending visitation although visitation

---

[4] This court granted the Department's request for judicial notice of the juvenile court's orders from the February 8, 2016 hearing.

11

had been restored to the mother when the juvenile court subsequently terminated jurisdiction and entered a family-law exit order.  In that case, the mother argued that the juvenile court's finding of detriment—the basis for the visitation suspension order—"create[d] the possibility of prejudice in subsequent family law proceedings." (*Id.* at p. 1489.)  Although the appellate court termed the mother's concern "highly speculative," it proceeded to consider the merits of her claim "in an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order [citations]." (*Ibid.*)

In the present case, the father contends that the visitation suspension order had an actual effect on him because even after visitation was reinstituted, it was at a less frequent rate (once a week instead of twice a week) and—initially—for less time per visit (one hour at a time instead of two hours at a time).  The father asserts that the suspension order could also affect future proceedings, since a parent's regular and consistent visitation is a factor in determining whether to continue a case to the 12-month hearing (Cal. Rules of Court, rules 5.710(c)(1)(D)(i)(a)),[5] 18-month hearing, (rule 5.715(b)(4)(A)(i)(a)), or 24-month hearing (rule 5.720(b)(3)(A)(i)).  The father points out that regular visitation can support a finding of a beneficial parent-child relationship, which is an exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 594.)  The father additionally contends that the issue presented here—whether the juvenile court may suspend visitation "pending a future event"—is of considerable public interest, and capable of repetition while avoiding review.

Here, as in *C.C.*, the father's concerns appear to be "highly speculative," since the father's visitation was reinstated after a few months and recently increased, and since the juvenile court ordered another six months of reunification services.  (See *C.C., supra*,

---

[5] All further rule references are to the California Rules of Court.

172 Cal.App.4th at p. 1489.) Nevertheless, in recognition of the fact that the father's relationship with the child was "subject to erosion" during the time the suspension order was in effect (see *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769) and "in an abundance of caution" (*C.C., supra*, at p. 1489), we will proceed to consider the merits of the father's claim.

### B.      Granting of Section 388 Petition/Suspension of Visitation

At a hearing on a section 388 petition, the juvenile court's task is to determine whether the Department has demonstrated by a preponderance of the evidence that there is new evidence or a change of circumstances demonstrating that it was in the child's best interests that the previous order be modified. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) "The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citations.]" (*Id.* at pp. 415-416.)

Section 362.1 requires visitation to be included in reunification services "[i]n order to maintain ties between the parent or guardian . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian" (*id.*, subd. (a)) and requires visitation to be "as frequent as possible, consistent with the well-being of the child" (*id.*, subd. (a)(1)(A)), except that "[n]o visitation order shall jeopardize the safety of the child" (*id.*, subd. (a)(1)(B)). "In other words, when reunification services have been ordered and are still being provided, . . . some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety.*" (*C.C., supra,* 172 Cal.App.4th at p. 1491, fn. omitted.) The juvenile court also "has the power to suspend visits when continuing them would be harmful to a child's emotional well-being." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357 (*Brittany C.*).)

In this case, the father contends the juvenile court applied the wrong legal standard when it ordered his visitation suspended because it found "a serious risk of physical and

emotional harm to the child" but not "an actual *threat* to [the child's] *safety*." We do not believe that "a serious risk of physical and emotional harm" is substantively different than a threat to the child's safety. In fact, the court in *Brittany C.* upheld a visitation suspension order based on evidence that visitation would "put the [children] at risk of physical harm." (*Brittany C., supra,* 191 Cal.App.4th at p. 1357.)

The father also contends there was no evidence to support the juvenile court's finding that visits between the father and the child would pose a "serious risk of physical and emotional harm to the child." The father points out that some of the evidence was not new, such as the incident at the doctor's office, the father's history of violence, and the father's positive test for methamphetamine. The father contends that other evidence, including the running across the street incident, the threats, and the incident in which the father had used PCP, did not show any risk to the child. The father contends that the child's safety was adequately protected by the prior order for supervised visitation. (See *C.C., supra,* 172 Cal.App.4th at p. 1492 [no evidence that mother presented a threat to child's physical safety "during monitored visitation in a therapeutic setting"].)

We find no abuse of discretion by the juvenile court. The juvenile court reasonably found that even if supervised visits were to continue, the child's physical and emotional safety were at risk.

First, the father had recently been placed on a mental health hold due to the incident in the flower shop, in which the father indicated he was looking for ammunition and caused the shop employee to become fearful. Viewed in light of the father's prior erratic and disruptive behavior during visits, this recent incident showed the seriousness of the father's mental health problems and that, without psychiatric treatment, there was a well-founded danger that the father would act in a threatening or violent manner during a visit with the child. Considering the father's threats, possible possession of a firearm, and anger at Department representatives, there was a very real possibility that defendant's

14

violence would be directed at the visitation supervisor during a visit, which would pose a risk to the child's physical and emotional safety.

Second, the father admitted that after the flower shop incident, he had an extremely high level of PCP in his system, and the juvenile court found he was not credible in claiming that he had not intentionally taken the drug.[6] Considering the father's prior attempts to blame others for his drug use and failure to engage in any drug treatment services, this recent incident showed there was a serious risk that the father would be under the influence of a controlled substance during a visit with the child.

Finally, the new evidence included the visitation incident in which the father ran across a street, in front of moving traffic, while holding the child. Although the father provided an explanation for his behavior and minimized the danger it had posed to the child, the juvenile court found him not credible. The juvenile court could reasonably find that this evidence showed that further visitation would pose a threat to the child's physical safety, such that visitation should be suspended pending a psychiatric evaluation. (See *Brittany C., supra,* 191 Cal.App.4th at p. 1358 [finding "nothing improper in the court taking a step back to consider the recommendations of a therapist and the desires of the children before attempting to fashion a visitation plan that has a hope of success"].)

In sum, the juvenile court's order suspending the father's visitation was not an abuse of discretion.

## IV. DISPOSITION

The juvenile court's July 31, 2015 order suspending the father's visitation is affirmed.

---

[6] Such a credibility determination is within the juvenile court's province, not to be overturned on appeal. (*In re Walter E.* (1992) 13 Cal.App.4th 125, 139-140.)

15

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.

*In re E.L.; DFCS v. D.R.*
**H042777**